UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                                    Case No. 8:09-bk-28144-KRM
                                                                          Chapter 7
JEREMY S. ELLIS and
KIMBERLY J. ELLIS,

      Debtors.
_____/

ALUMINUM SPECIALTIES                                  Case No. 8:10-ap-00412-KRM
WHOLESALE, INC.,

      Plaintiff,

v.

JEREMY S. ELLIS,

      Defendant,
_____/

**MEMORANDUM OPINION AND**
**FINAL JUDGMENT IN FAVOR OF DEFENDANT**

      This is an adversary proceeding to determine whether a debt is excepted from discharge, pursuant to 11 U.S.C. § 523(a)(2) and (6).[1]  After a trial, an oral ruling in favor of Mr. Ellis, appearing *pro se*, was read into the record in open court (Document No. 25).  This memorandum opinion supplements the bench ruling which is incorporated herein by reference.

      The defendant, one of the debtors in this Chapter 7 case, owned C&J Aluminum, Inc. ("C&J"), a company that installed pool screening enclosures.  Aluminum Specialties Wholesale, Inc. ("ASW") was C&J's principal supplier of materials.  ASW now seeks a determination that Mr. Ellis is liable for, and cannot obtain a discharge of approximately $39,000 of C&J's unpaid

---

[1] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

debt. Essentially, ASW argues that Mr. Ellis defrauded it by submitting false "no lien" affidavits to homeowners to obtain final payment for jobs, then failing to pay ASW for the materials. Alternatively, ASW asserts that Mr. Ellis willfully or maliciously injured it by causing C&J not to pay its debt. For the reasons stated in the bench ruling, as supplemented more fully below, judgment will be entered in favor of the defendant.

## BACKGROUND

Mr. Ellis was a licensed building contractor and the owner of C&J. C&J had a decent history of making regular payments to ASW for over two years, maintaining a zero credit balance from April 2006 to June 2008. In early 2008, the debtor worked out a payment arrangement with ASW's president, Michael Tisdale, who knew C&J was experiencing financial difficulty. Even knowing that fact, ASW agreed to sell materials to C&J on credit: (1) ASW invoices for delivered materials would be labeled by each specific job, either by owner name or street name; (2) C&J would collect from the homeowners after completion of the pool enclosure; and (3) the proceeds that C&J received from the homeowners would be used to pay the ASW invoice referring to that job. The arrangement thus recognized that the money would go from the property owners to C&J, which would then pay ASW.

All parties understood that ASW would not file construction liens against the homeowners' properties. No mechanisms were put in place, however, to perfect a construction lien by recording notices to the owners or to have the homeowners make payment jointly to C&J and ASW. Both the general manager and the president of ASW testified that it would have been disruptive in this type of business to make such formal arrangements. ASW did not request or obtain a security interest in C&J's accounts receivable.

To receive final payment from the homeowners, the debtor was required to deliver

affidavits representing that all lienors had been paid in full. The arrangement with ASW implicitly recognized that C&J would need to submit such affidavits to obtain payment from the homeowners.

Between January and June 2008, C&J timely paid ASW's invoices for materials. But, thereafter C&J became delinquent and ASW began demanding payments for specific invoices. ASW threatened to stop deliveries until further payment was received. In one instance, C&J issued three different checks to pay one invoice to satisfy ASW's demands.

Even in the face of C&J's delinquencies, ASW made two additional deliveries of materials, on August 20, 2008, and September 3, 2008. The unpaid invoices for materials totaled $33,504.70, for three jobs, identified as "Weis," "Pollard" and "Kursing." It is undisputed that C&J had received payment from these three homeowners by delivering "no lien" affidavits.

By August of 2008, C&J had run out of money and ceased doing business. It was administratively dissolved in September 2008, for failure to file its annual report; C&J filed a voluntary Chapter 7 petition on September 30, 2009 (Case No. 08:09-22131-CED). By that time, ASW had obtained a state court judgment against C&J in the amount of $38,800.99. ASW filed a proof of claim for $39,684.82 in C&J's bankruptcy case. Three months later, on December 10, 2009, Mr. and Mrs. Ellis filed their joint Chapter 7 petition. They listed ASW as an unsecured credit on Schedule F in the amount of $39,116.

## DISCUSSION

The plaintiff claims that Mr. Ellis cannot discharge the $38,800 that C&J owed ASW, pursuant to 11 U.S.C. § 523(a)(2) or (6). ASW argues that Mr. Ellis engaged in a pattern of issuing a series of false affidavits to the homeowners to induce their payments, in violation of Florida's Construction Lien Law, Section 713.01, et seq., Florida Statutes (2009). ASW claims

that the debtor falsely represented to homeowners Wies, Pollard and Kursing that all lienors had been paid in full (or that ASW was not a lienor on a specific project). ASW contends that this action worked to deprive it of lien rights against the homeowners' properties that it could have pursued under Chapter 713 of the Florida Statutes.

To except a debt from being discharged, Section 523(a)(2)(A) requires proof that the *debtor* obtained money, property, services or an extension of credit by false pretenses, a false representation, or actual fraud. The plaintiff must prove the traditional elements of common law fraud by a preponderance of the evidence; that: (1) the debtor made a false representation with the purpose and intent of deceiving the creditor; (2) the creditor relied on the misrepresentation; (3) the creditor's reliance was justifiable; and (4) the creditor sustained a loss as a result of the representation. *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996); *Grogan v. Garner*, 498 U.S. 279, 287 (1991). The cornerstone element is the misrepresentation made with intent to deceive the creditor. *Garfinkel v. Gracia (In re Gracia),* 2010 Bankr. LEXIS 4315, *10 (Bankr. M.D. Fla. 2010). The creditor must also prove reliance on the intentional misstatements by the debtor. *Id. (citing City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277, 280 (11th Cir. 1995)).

Under Section 523(a)(6), a debt is excepted from the discharge if it arose from a willful and malicious injury by the debtor to another entity or to its property. "A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Thomas v. Loveless* (*In re Thomas)*, 288 Fed. Appx. 547, 549 (11th Cir. 2008). As to the "malicious" prong, the term has been defined as "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Id.*

Initially, the court concludes that ASW was not a creditor of Mr. Ellis. For this reason alone, plaintiff must be denied relief. ASW was a creditor of C&J and filed a proof of claim in the corporation's Chapter 7 case. Mr. Ellis is not a guarantor of the debt. There is no proof that Mr. Ellis so abused the corporate form that this court should regard him as the corporation's alter ego. Even if Mr. Ellis took money out of his business while it was insolvent, that would not, in and of itself, make him an alter ego of the corporation. *See Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So. 2d 1114 (Fla.1984) (setting forth the rule that the corporate veil will not be pierced, unless it is shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them).

Further, C&J did not obtain credit or goods from ASW by means of false misrepresentations or fraud within the meaning of Section 523(a)(2). C&J's failure to pay is no different from any garden variety breach of contract. The debt was incurred when ASW delivered the materials. There is no proof of any misrepresentation or fraud used to obtain the *delivery* of the materials. Indeed, ASW knew of C&J's credit risk some eight months before the last three deliveries of materials was made. Nothing indicates that the debtor made any misrepresentations to ASW contemporaneously with the delivery of goods in June, July, August, and even September, after C&J's defaults were well apparent to ASW.

The only misrepresentation alleged is that C&J gave false "no lien" affidavits to three homeowners, inducing them to pay C&J. But, that was an inherent feature of the arrangement between C&J and ASW. It was not a misrepresentation to ASW to induce the extension of credit; by then the goods had been delivered and the debt already been created. Moreover, the arrangement agreed to by ASW -- materials sold on credit to C&J, with C&J to collect final payment from the homeowners before paying ASW -- actually required C&J to give each

homeowner the "false" affidavit that ASW now attacks. Whatever other legal consequences arose from C&J's delivery to the *homeowners* of the "no lien" affidavits, they were not false representations to ASW on which it relied to extend credit.

The Court also concludes that there is no proof of intention to injure or malice by Mr. Ellis, as required by Section 523(a)(6). No action by C&J or Mr. Ellis deprived the plaintiff of its rights under Florida's Construction Lien Law. The payment arrangement implicitly recognized that C&J, to whom goods were sold on credit, would have to submit a final "no-lien" affidavit to get paid by the homeowners. The testimony of ASW's witnesses clearly establishes that they voluntarily elected not to preserve their lien rights. The delivery to the homeowners of "no lien" affidavits was implicitly condoned by ASW, by the very arrangement the parties had established in early 2008.

For the reasons stated orally and recorded in open court on January 11, 2011, which shall constitute the decision of this Court, as supplemented by this memorandum opinion, judgment is entered in favor of the Defendant.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on <u>October 13, 2011</u>.

K. Rodney May
United States Bankruptcy Judge